TEITELBAUM LAW GROUP, LLC
*Counsel for the Debtors and*
*Debtors in Possession*
1 Barker Avenue, Third Floor
White Plains, New York 10601
Tel: (914) 437-7670
Fax: (914) 437-7672
Email: jteiltelbaum@tblawllp.com
Jay Teitelbaum, Esq.
David Brooks, Esq.

Hearing Date: January 24, 2019
Hearing Time: 11:00 a.m.
Objection Deadline: January 17, 2019

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

In re:

E & J MACON LLC, *et al.*,[1]

Debtors.

Chapter 11
Case No. 1:18-40321-nhl

*Jointly Administered*

## DISCLOSURE STATEMENT FOR DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION

**I.    INTRODUCTION**

E & J Macon LLC, 1596 Pacific Realty LLC, 1049 Bergen Realty LLC and 401 Macon

Realty LLC, (each a "**Debtor**" and collectively the "**Debtors**") submit this joint Disclosure

Statement for Debtors' Joint Chapter 11 Plan of Reorganization (the "**Disclosure Statement**")

pursuant to Section 1125(b) of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (the

"**Bankruptcy Code**") and Rule 3017 of the Federal Rules of Bankruptcy Procedure (the

---

[1] Pursuant to order entered January 31, 2018 (ECF Docket No. 15), the Debtors jointly administered under this caption, along with E&J Macon LLC ("**E&J Macon**"), are 1596 Pacific Realty LLC ("**Pacific Realty**"), Case No. 18-40410-nhl, 1049 Bergen Realty LLC ("**Bergen Realty**"), Case No. 18-40412-nhl and 401 Macon Realty LLC ("**Macon Realty**"), Case No. 18-40409-nhl.

"**Bankruptcy Rules**"), in connection with their Joint Chapter 11 Plan of Reorganization dated December 21, 2018 (the "**Plan**") to all known holders of Claims against or Interests in the Debtors in order to adequately disclose information deemed to be material, important and necessary to make a reasonably informed judgment about the Plan, including who is entitled to vote to accept or reject the Plan.  A full copy of the Plan is attached to this Disclosure Statement as **Exhibit "A"**. *Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*

The Bankruptcy Court has not yet approved this Disclosure Statement. Upon approval by the Bankruptcy Court the Disclosure Statement will provide:

"The Bankruptcy Court approved this Disclosure Statement under section 1125(f)(3) of the Bankruptcy Code by Order dated January __, 2019 (ECF Docket No. ___) and has scheduled a hearing to consider confirmation of the Plan for February __, 2019 at __:__ __.m. (the "**Confirmation Hearing**")."

Under section 1126(b) of the Bankruptcy Code, only Classes of Allowed Claims and Interests that are "impaired" under the Plan, as defined by section 1124 of the Bankruptcy Code, are entitled to vote on the Plan. Generally, a Class is impaired if its legal, contractual or equitable rights are altered under the Plan.

**Under the Plan, all Allowed Claims will be paid in full within 10 business days of the Effective Date of the Plan and holders of Interests in the Debtors shall retain such interests. Accordingly, no claims or interests or classes of claims or interests are impaired under the Plan and creditors and interest holders will not be solicited to vote to accept or reject the Plan.  All creditors and interest holders will be deemed to have accepted the Plan.**

2

If the Plan proposed to impair creditors and interest holders, to be accepted by an impaired Class, the Plan must be accepted by (i) more than one half in number and two-thirds in dollar amount of the Allowed Claims actually voting in such Class; and (ii) at least two- thirds in dollar amount of the Allowed Interests actually voting in such Class.

## A.  Purpose of This Document

**This Disclosure Statement describes:**

- The Debtors and significant events during the bankruptcy case;
- How the Plan proposes to treat claims and interests of the type you hold (*i.e.*, what you will receive on your claim or interest if the plan is confirmed and your claim or interest is "allowed" within the meaning of the Plan);
- Who can vote on or object to the Plan;
- What factors the Bankruptcy Court (the "**Court**") will consider when deciding whether to confirm the Plan;
- Why the Debtors believe the Plan is feasible, and how the treatment of your claim or interest under the Plan compares to what you would receive on your claim or interest in liquidation; and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

## B.  Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet approved this Disclosure Statement or confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

### 1.  *Time and Place of the Hearing to Confirm the Plan*

The hearing at which the Court will determine whether to confirm the Plan will take place on **_____, 2019 at _____.m.** before the Honorable Nancy Hershey Lord, United States Bankruptcy Judge, at the United States Bankruptcy Court, Courtroom 1595 in the Conrad B. Duberstein U.S. Courthouse, 271-C Cadman Plaza East, Brooklyn, New York 11201.

    *2.  Deadline For Voting to Accept or Reject the Plan*

No Claims or Interests are Impaired under the Plan.  Pursuant to Bankruptcy Code §
1126(f), all claims and interests are deemed to have conclusively accepted the Plan. Therefore,
no holders of Claims or Interests will be solicited to vote on the Plan.

    *3.  Deadline For Objecting to the Confirmation of the Plan*

Objections to the confirmation of the Plan must be filed with the Court and served upon
Teitelbaum Law Group, LLC, Counsel for the Debtors, 1 Barker Avenue, 3rd Floor, White
Plains, New York 10601, Attn: Jay Teitelbaum, Esq. jteitelbaum@tblawllp.com by
_____**, 2019 such as to be received by 5 p.m. on such date.**

    *4.  Identity of Person to Contact for More Information*

If you require additional information about the Plan, you should contact Teitelbaum Law
Group, LLC, Counsel for the Debtors, 1 Barker Avenue, 3rd Floor, White Plains, New York
10601, Attn: Jay Teitelbaum, Esq., (914) 437-7670 or jteitelbaum@tblawllp.com.

**C.  Disclaimer  To be inserted following approval of Disclosure Statement:**

    ***The Court has approved this Disclosure Statement as containing adequate information
to enable parties affected by the Plan to make an informed judgment about its terms. The
Court has not yet determined whether the Plan meets the legal requirements for confirmation,
and the fact that the Court has approved this Disclosure Statement does not constitute an
endorsement of the Plan by the Court, or a recommendation that it be accepted.***

## II.  <u>BACKGROUND</u>

**A.  Description of the Debtors and Ownership of the Debtors**

Three of the four debtors is a single asset real estate company, as such term is defined and
used in Bankruptcy Code §§101(51)(B) and 362(d)(3). The fourth Debtor is a single member

LLC 100% owned by Ervin Johnson, Jr. ("**Johnson**") and which, as of the filing date, did not own any assets or have any operations. The three operating Debtors are New York limited liability companies engaged in the business of owning and operating multifamily/mixed use properties in the City of New York.

The properties at issue in these cases are as follows:

- an 8-unit building located at 1596 Pacific Street, Brooklyn, NY ("**Pacific Street**"), owned by Debtor 1596 Pacific Realty, LLC;

- a 4-unit building located at 1049 Bergen Street, Brooklyn, NY ("**Bergen Street**"), owned by Debtor 1049 Bergen Realty, LLC; and

- a 16-unit building at 401 Macon Street, Brooklyn, NY ("**Macon Street**" and together with Pacific Street and Bergen Street, the "**Premises**"), owned by Debtor 401 Macon Realty, LLC.

The ownership and management of the Debtors as of the Petition Date is as follows:

**E&J Macon LLC**:

- Ervin Johnson, Jr. 100% owner/ manager

**401 Macon Realty LLC**:

- Manager Mark J. Nussbaum
- 401 Macon Johnson LLC – 51% owner of Debtor
  - Ervin Johnson, Jr. - 100% owner of 401 Macon Johnson LLC
- 401 Macon Holdings LLC – 49% owner of Debtor
  - Mark J. Nussbaum – 100% owner of 401 Macon Holdings LLC

**1049 Bergen Realty LLC**:
- Manager Mark J. Nussbaum
- 1049 Bergen Johnson LLC – 51% owner of Debtor
  - Ervin Johnson, Jr. - 100% owner of 1596 Pacific Johnson LLC
- 1049 Bergen Holdings LLC – 49% owner of Debtor
  - Mark J. Nussbaum – 100% owner of 1049 Bergen Holdings LLC

**1596 Pacific Realty LLC**:
- Manager Mark J. Nussbaum
- 1596 Pacific Johnson LLC – 51% owner of Debtor
  - Ervin Johnson, Jr. - 100% owner of 1596 Pacific Johnson LLC
- 1596 Pacific Holdings LLC – 49% owner of Debtor
  - Mark J. Nussbaum – 100% owner of 1596 Pacific Holdings LLC

## B. Events Leading to Bankruptcy

The Premises were originally owned by, and titled to, Johnson. Johnson is a 71 year old man, retired from 13 years of service at the United States Postal Service and 20 years with the New York City Department of Sanitation. From his savings, Johnson purchased the Premises between 1987 and 1998.

Johnson is not a sophisticated business person or rental property operator, and over the years under his ownership the Premises fell into disrepair. As a result, the City of New York issued numerous violations against the Premises. Johnson lacked the resources to cure these violations or pay the attendant fines and penalties. As the Premises fell into further disrepair, fines mounted and tenants withheld rent- - exacerbating the financial distress in operating the Premises.

In the spring/summer of 2015, Johnson met John Clarke ("**Clarke**"), who purported to be a deacon at a local church. Clarke held himself out as someone Johnson could trust to manage the Premises.  Clarke claimed to have the experience and contacts necessary to navigate New York City's myriad departments and agencies with jurisdiction over housing. Clarke further indicated he could arrange financing to fund necessary repairs to and renovation of the Premises. Clarke convinced Johnson to execute a management agreement with Seaview Management Associates Corp. ("**Seaview**") (a company Clarke owned and operated), which granted Clarke broad powers over the management of the Premises and the associated rental income.

6

Clarke arranged for a $3,650,000 loan to be made to Johnson by Hirshmark Capital (the "**Macon Loan**") through Hirshmark's affiliate, Macon Funding Associates ("**Macon Funding**"), and secured by a first mortgage on the Premises (the "**Macon Mortgage**"). As a condition to extending the Macon Loan, Macon Funding required, among other things, that the Premises be transferred from Johnson's personal name into a real estate holding company.  Debtor, E&J Macon was formed for this purpose in September 2016 substantially contemporaneously with the closing of the Macon Funding Loan. At all times, Johnson has been the sole member of E&J Macon.

The Macon Loan closed on or about September 29, 2016. At closing, Johnson executed the Macon Mortgage and other loan documents, as well as deeds transferring title to each of the Premises into E&J Macon. The bulk of the proceeds of the Macon Loan were used to pay off delinquent taxes, tax liens, municipal fines, and mortgages affecting the Premises.

The remaining proceeds of the Macon Loan were intended to be used to operate, repair and renovate the Premises, but, upon information and belief, were diverted by Clarke for his own benefit. Thereafter, Clarke exploited his position of trust with Johnson and his signatory rights on the E&J Macon operating account, to divert the rental income from the Premises.  Over the course of about a year under Clarke's management, the Premises fell into further disrepair, additional violations, liens, and fines were assessed against the Premises, and the Macon Loan fell into default.

In early 2017, Johnson became aware of Clarke's theft and mismanagement and learned that the Premises were at risk of foreclosure. Johnson terminated the Seaview Management agreement and severed his relationship with Clarke. Johnson thereafter retained USA Quick Solutions Corp. to replace Seaview as property manager and began looking to refinance the

Macon Loan. This search led Johnson to Mark J. Nussbaum ("**Nussbaum**"), who agreed to provide interim funding for the renovation and maintenance of the Premises, in the form of a second mortgage on the Premises, and to assist with procuring a permanent loan to refinance the Macon Loan and such second mortgage.

While conducting due diligence, Nussbaum learned that Clarke had recorded a fraudulent operating agreement against the Premises within which he asserted a 60% ownership interest in E&J Macon and, by extension, the Premises.

Nussbaum and Johnson were concerned that Clarke had recorded the fraudulent operating agreement in the land records for the purpose of establishing his authority to encumber or sell the Premises as agent of E&J Macon.  To head off any such encumbrance or sale, Nussbaum and Johnson formed three new holding companies (Pacific Realty, Bergen Realty and Macon Realty) and transferred the Premises from E&J Macon to each of these Debtors by deeds dated June 26, 2017 and recorded July 24, 2017 in the Office of the City Register of the City of New York.

Johnson then commenced an action on or about July 5, 2017 against Clarke and Twuana Janvier, seeking damages arising from or relating to the Fraudulent Operating Agreement. This action is pending in the Supreme Court in Brooklyn as *Ervin Johnson v. E&J Macon LLC, John Clarke and Twuana N. Janvier,* 513064/2017, Kings County Supreme Court (the "**Fraud Action**"). As a result of the order and judgment entered in this case regarding Clarke (discussed *infra)*, Johnson, by his separate counsel, is seeking dismissal of the Fraud Acton.

The Fraudulent Operating Agreement created a cloud on Johnson's ownership of E&J Macon and the Debtors' right, title and interest in the Premises.  Indeed, the recording of the Fraudulent Operating Agreement and the defaults under the Macon Loan were the precipitating factor in filing these Bankruptcy Cases. With the cloud on title created by Clarke, the Debtors

could not obtain financing to repay the Macon Loan, repair and maintain the Premises and operate their businesses.

### C. Significant Events During the Bankruptcy Case

#### 1. Commencement and Administration of the Cases

On January 19, 2018 (the "**First Petition Date**"), E&J Macon filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On January 25, 2018 (the "**Second Petition Date**" and together with the First Petition Date, the "**Petition Date**"), each of Pacific Realty, Bergen Realty, and Macon Realty filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

By order entered January 31, 2018 and filed on February 1, 2018 as ECF Doc. No. 15, the Court approved the Debtors' request for joint administration of their Chapter 11 Cases. The cases were assigned to the Hon. Nancy Hershey Lord, United States Bankruptcy Judge, for administration under the Bankruptcy Code.

The Debtors have continued in possession of their property and the management of their business affairs as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been heretofore appointed in this proceeding. No official committee of unsecured creditors has been formed.

#### 2. Employment of the Debtors' Professionals and Fee Applications

At the outset of this case, the Debtors retained Teitelbaum Law Group, LLC ("**TLG**") as their bankruptcy counsel in these bankruptcy cases. The retention of TLG was approved by an Order of the Bankruptcy Court dated February 24, 2018, *nunc pro tunc* as of the Petition Date (ECF No. 28). Separately, by order of the Bankruptcy Court dated February 24, 2018, (ECF No. 29), Colasanti & Iurato, LLP ("**C&I**") was retained as the Debtors' accountants.

As of the filing of this Disclosure Statement, professionals have filed two interim fee applications as follows:

- **Teitelbaum Law Group**:

    o First Interim Fee Application:

| | |
|---|---|
| Total Fees Requested: | $   84,246.00 |
| Total Fees Allowed | $   67,396.80 |
| Total Holdback (If Applicable) | $   16,849.20 |
| Total Expenses Requested: | $    6,178.27 |
| Total Expenses Allowed To Date: | $    6,178.27 |
| Total Received By Applicant | |
|     Fees | $    13,821.73 |
|     Expenses | $    6,178.27 |
| Total | $   20,000.00 |
| Remaining Unpaid Allowed Fees | $   53,575.07 |
| Total Retainer | $    5,288.50 |

    o Second Interim Fee Application (Hearing Scheduled for January 24, 2019)

| | |
|---|---|
| Total Fees Requested | $ 58,869.00 |
|     80% of Fees | $47,095.20 |
|     20% Holdback | $11,773.80 |
| Total Expenses Requested | $2,055.09 |

Estimated fees and Expenses for the period October 1, 2018 through the Effective Date is $85,000.

- Colasanti & Iurato

    o First Interim Application

| | |
|---|---|
| Total Fees Requested: | $   12,947.00 |
| Total Fees Allowed | $   10,357.60 |
| Total Holdback | $    2,589.40 |
| Total Expenses Requested: | $        0.00 |
| Total Expenses Allowed | $        0.00 |
| Total Payments Received | $   10,357.60[2] |

---

[2] Applicant has not sought monthly interim payments pursuant to Administrative Order No. 583. These fees were paid from Applicants' pre-petition retainer

| | | |
|---|---|---|
| | Retainer | $20,000.00 |
| | Fees Paid from Retainer | $ 10,357.60 |
| • | Retainer Balance | $ 9,642.40 |

- Second Interim Application (Hearing Scheduled for January 24, 2019)

| | |
|---|---|
| Total Fees Requested | $ 11,174.00 |
| 80% Fees | $ 8,939.20 |
| 20% Holdback | $ 2,234.80 |

Estimated fees and Expenses for the period October 1, 2018 through the Effective Date is $25,000.

       *3.  Filing of Schedules of Assets and Liabilities and Statement of Financial Affairs*

On March 6, 2018, the Debtor filed its Schedules of Assets and Liabilities, together with its Statement of Financial Affairs (collectively, the "**Schedules**", ECF Nos. 33-35). The Debtor's Schedules are available on the Bankruptcy Court's website: www.nysb.uscourts.gov.

       *4.  Claims Bar Dates*

On March 2, 2018, the Court entered an order (the "**Bar Order**") establishing the deadline for filing proofs of claim and proofs of interest in the Debtors' cases (ECF No. 32), setting April 30, 2018 as the general Bar Date (and July 24, 2018 as the bar date for governmental units) in each case. On March 8, 2018, a notice of entry of the order was mailed to all creditors listed on the Debtors' creditor matrixes filed with the Bankruptcy Court (See ECF Nos. 32-1 and 38).

On December 11, 2018, the Debtors filed an application to establish January 24, 2019 as the administrative claims bar date for all administrative claims other than for professionals retained by the Debtors, the DIP Lender and the U.S. Trustee (ECF Docket No. 121). As of the filing of this Disclosure Statement the Court has not entered an order establishing an administrative claim bar date.

       *5.  341 Meeting and Case Status Conferences*

On March 9, 2018, the Debtors attended their Initial Debtor Interview and Section 341(a) Meeting of Creditors. The Debtors also appeared at the initial case conference in this Bankruptcy proceeding before the Hon. Nancy Hershey Lord on February 15, 2018, and Debtors' counsel has appeared at all hearings and case conferences as scheduled by the Bankruptcy Court.

### 6. *Post-Petition DIP Lending*

The Debtors had insufficient cash to make adequate protection payments to Macon Funding and to operate, repair, and renovate the Premises. Nussbaum (the "**DIP Lender**") agreed to loan the Debtors up to $300,000 (the "**Original DIP Loan**") pursuant to § 364(b) of the Bankruptcy Code. An order approving the Original DIP Loan on an interim basis was entered by the Bankruptcy Court on March 26, 2018 (ECF No. 43), and the Original DIP Loan was approved on a final basis pursuant to order of the Bankruptcy Court entered April 22, 2018 (ECF No. 59). The Debtors subsequently determined that the proceeds of the Original DIP Loan were insufficient to fund their post-petition expenses. On June 26, 2018, the Debtors filed a motion seeking approval to supplement the Original DIP Loan with an additional advance or advances to be made by Nussbaum totaling up to $275,000.00 (the "**Additional DIP Loan Advance**"). The Bankruptcy Court approved this motion by order dated July 26, 2018 (ECF No. 109). The Original DIP Loan, as increased by the Additional DIP Loan Advance, has been fully drawn by the Debtors and is hereinafter collectively referred to as the "**DIP Loan**". The DIP Lender holds an administrative priority claim and a lien upon all assets of the Debtors, junior to valid and duly perfected liens as of the Petition Date and as of the approval of the additional DIP Loan Advance, respectively. The DIP Loan provided that it matured upon, among other things, the earliest to occur of the effective date of a Chapter 11 plan and December 31, 2018. The Dip Lender agreed to amend the definition of Maturity Date from December 31, 2018 to June 1, 2019

and such amendment was approved by order of the Bankruptcy Court on December 15, 2018 (ECF Docket No. 127). This amendment avoided the Debtor incurring default interest on the DIP Loan as of December 31, 2018.

7.   *Clarke Adversary Proceeding:*

The Debtors have expunged the interests of Clarke in the Debtors and the Premises. The Debtors (i) obtained 2004 Orders to take discovery of Clarke and various other parties (ECF Docket Nos. 58; (ii) objected to the claim and interest of Clarke (ECF Docket No. 64); and commenced an adversary proceeding captioned *E& J Macon LLC, 1596 Pacific Realty LLC, 1049 Bergen Realty LLC and 401 Macon Realty LLC v. John Clarke,*  Adv. Proc. 18-01068. On August 17, 2018, Judgment was entered in favor of the Debtors expunging all interest of Clarke in the Debtors and the Premises. This Judgment was recorded with the City Register of the City of New York on August 29, 2018 (Control No. 2018000290499).  The bankruptcy process saved the Debtors years of potential litigation in the state courts, efficiently removing the most significant obstacle to the reorganization.

8.   *Settlement of MPW Claim Action*:

Pursuant to an order dated May 30, 2018 (ECF Docket No. 77), the Debtor and MPW Funding settled a dispute regarding an alleged contract executed by the Debtor and MPW wherein, among other things, the Debtor was granted a right to re-purchase property commonly known as 346 East 9th St., Brooklyn, N.Y. The parties disputed whether the original sale to MPW was valid and whether the Debtor's right to purchase the property had expired.  The dispute was also the subject of a state court action. Pursuant to the settlement the Debtors were paid $40,000 to release their claims under the contract to re-purchase the property and dismiss the action. The settlement saved the estates months of costly and uncertain litigation.

13

*9.  Claim Objections:*

The Debtors objected to a handful of claims, including claims filed by (i) the New York City Department of Finance, for general corporate taxes and unincorporated business taxes, and (ii) Macon Funding. Pursuant to an order entered July 29, 2018, the claims of the City of New York were disallowed, subject to the right to file amended claims following the filing of certain tax returns by Johnson and the Debtors.

*10. Macon Funding Claim Settlement*

The Macon Funding Loan represents the single largest secured claim in the cases and encumbers the Premises with a first priority lien and security interest. The resolution of this claim is the second pillar to confirmation of a Chapter 11 plan. Debtors objected to the Macon Funding Loan on, among other grounds, that the loan was usurious. Following extensive settlement negotiations, the Debtors and Macon Funding reached an agreement as to the amount and treatment of the Macon Funding Loan as set forth in that certain Stipulation of Settlement, So Ordered by the Court on December 15, 2018 (ECF Docket No. 127).

## THE PLAN OF REORGANIZATION

The following is a brief summary of the Plan. The Plan represents a proposed legally binding agreement and creditors and interest holders are urged to consult with their counsel in order to fully understand the Plan and to make an intelligent judgment concerning it. The Plan governs over any discrepancy in this summary.

As required by the Bankruptcy Code, the Plan places claims and interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

Attached hereto as **Exhibits "B-H"** are schedules of all claims and the proposed treatment of such claims.

## A. Treatment of Unclassified Claims Under the Plan

Certain types of claims are automatically entitled to specific treatment under the Bankruptcy Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Bankruptcy Code. As such, the Debtors have *not* placed the following claims in any class:

### 1. *Allowed Administrative Claims other than Claims of Professionals*

Administrative claims are costs or expenses of administration in connection with the Chapter 11 Cases, including, without limitation, any actual, necessary costs and expenses of preserving the Debtors' estates, claims arising post-petition, and all fees and charges assessed against the Debtors' estates pursuant to 28 U.S.C. § 1930. The term Administrative Claim does not include Fee Claims and quarterly fees owed to the Office of the U.S. Trustee, which are treated separately in this Plan. These Allowed Claims shall be paid in Cash within 10 business days after the Effective Date from the Plan Distribution Fund. The Debtors' estimate of these claims outstanding on the Effective Date is set forth on **Exhibit "C"** hereto.

### 2. *Allowed DIP Lender Claim*

The DIP Lender Claim constitutes the Administrative Claim of Nussbaum for his post-petition DIP Loan in the principal amount of $575,000. Pursuant to the terms of the DIP Loan, the DIP Loan accrued interest at the rate of 9% per annum, but no payments were required prior to the Effective Date. Assuming an Effective Date on or about February 28, 2019, the estimated accrued interest on the DIP Loan will be $40,487.50, and the reimbursable legal fees of the DIP

lender will be $15,000. Unless the DIP Lender agrees to different treatment, the DIP Lender Claim shall be paid in full in Cash within 10 business days after the Effective Date from the Plan Distribution Fund.

### 3. *Allowed Administrative Claims of Professionals*

These are Claims by any Professionals for compensation for legal and other services and reimbursement of expenses allowed or awarded under Bankruptcy Code sections 327, 328, 330(a), 331, 503(b) and/or 1103. The Debtors have two Professionals whose employment has been approved by the Bankruptcy Court; (i) the Debtor's bankruptcy counsel, TLG, and (ii) C&I as Accountants to the Debtors. The Allowed Administrative Claims of the Professionals shall be paid in full, in Cash, upon the later of (i) allowance by the Court pursuant to 11 U.S.C. § 330, or (ii) within 10 days after the Effective Date. The Debtors' estimate of these claims outstanding on the Effective Date is set forth on **Exhibit "D"** hereto.

### 4. *Statutory Fees*

These are claims for fees for which the Debtors are obligated pursuant to Section 1930(a)(6) of title 28 of the United States Code, together with interest, if any, pursuant to Section 3717 of title 31 of the United States Code. The Debtors shall pay outstanding Statutory Fees in full, in Cash, within 10 business days after the Effective Date. Such fees shall be paid in full, in Cash, in such amount as incurred in the ordinary course of business by the Debtors from the Post-Confirmation Reserve. Thereafter, the Debtors shall continue to pay Statutory Fees due and payable until the earlier of conversion of the Chapter 11 Cases to cases under Chapter 7 of the Code, dismissal or the entry of a final decree closing the Chapter 11 Cases. The Debtors have remained current on the payment of such fees and expect the amount due to be calculated based upon final distributions of approximately $6 million, or approximately $13,000.00.

16

5. *Allowed Priority Tax Claims*

Priority tax claims are unsecured income, employment, sales, and other taxes described by §507(a)(8) of the Bankruptcy Code. The Debtors shall pay all Allowed Priority Tax claims in full, in Cash from the Plan Distribution Fund within 10 business days after the Effective Date. The Debtors' estimate of these claims outstanding on the Effective Date is set forth on **Exhibit "E"** hereto.

**B.  Classes of Claims**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

1. *Class 1: Secured Claims*

Class 1 Claims consist of the Secured Claims of (i) Macon Funding (the first mortgage on the Premises); (ii) Mark J. Nussbaum, as Nominee (the second mortgage on the Premises); (iii) Tower Capital Management (2018 Tax Lien on Macon Street); (iv) the New York City Department of Finance (pre-petition taxes secured by liens on the Premises); (v) the New York City Water Board (pre-petition water/sewer rents secured by liens on the Premises); and (vi) New York City Office of Administrative Trials and Hearings ("**NYC OATH**") (ECB Violations affecting Premises). All Class 1 Claims will be paid in full to the extent allowed within 10 business days after the Effective Date of the Plan. To the extent any objection or litigation regarding any Class 1 Claims is pending on the Effective Date of the Plan, the full amount of such claims will be reserved until resolution of such objection or litigation.  Class 1 Claims are unimpaired and deemed to accept the Plan. The Debtors' estimate of these claims outstanding on the Effective Date is set forth on **Exhibit "F"** hereto.

2.     *Class 2:  Allowed Non-Tax Priority Claims*

Class 2 Claims consist of Claims entitled to priority under Section 507(a)(3)-(7) of the Bankruptcy Code.  Class 2 Claims shall each receive 100% of their Allowed Class 2 Claims in full within 10 business days of the Effective Date.  To the extent any objection or litigation regarding any Class 2 Claims is pending on the Effective Date of the Plan, the full amount of such claims will be reserved until resolution of such objection or litigation.  Class 2 Claims are unimpaired and deemed to accept the Plan. The Debtors' estimate of these claims outstanding on the Effective Date is set forth on **Exhibit "G"** hereto.

3.     *Class 3: Allowed General Unsecured Claims*

Class 3 consists of the holders of Allowed General Unsecured Claims. General Unsecured Claims are claims which are not either an Administrative Claim, Secured Claim, Priority Claim, or Interest that arose prior to the Petition Date and include, without limitation, Claims based upon pre-petition trade accounts payable or Claims based upon the rejection of an executory contract during the pendency of the Chapter 11 Case.

Class 3 Claim holders shall share in a distribution on a Pro Rata basis of the remaining monies in the Plan Distribution Fund, up to 100%, after payment in full of all Allowed unclassified, Class 1 Claims, Class 2 Claims, and the Post-Confirmation Date Reserve.  Class 3 Claim holders will receive a 100% distribution on account of their claims within 10 business days after the Effective Date of the Plan.  To the extent any objection or litigation regarding any Class 3 Claims is pending on the Effective Date of the Plan, the full amount of such claims will be reserved until resolution of such objection or litigation.  Class 3 Claims are unimpaired under the Plan and deemed to accept the Plan. The Debtors' estimate of these claims outstanding on the Effective Date is set forth on **Exhibit "H"** hereto.

4. *Class 4: Interests*

Interests are holders of an equity security of or membership interest in any of the Debtors, within the meaning of Bankruptcy Code sections 101(16) and (17), represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership or membership interest in a Debtor, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, including a partnership, limited liability company or similar interest. In addition, all funds remaining after the payment of all Allowed Claims shall be allocated equally among Debtors, Bergen Realty, Macon Realty and Pacific Realty and remitted to the Interest Holders according to their Interests in each such Debtor.

Class 4 consists of the Claims of holders of Interests in the Debtors. Class 4 Interests are as follows:

**E&J Macon LLC**: Ervin Johnson, Jr. 100% owner

**401 Macon Realty LLC**:

- 401 Macon Johnson LLC – 51% owner of Debtor
  - Ervin Johnson, Jr. - 100% owner of 401 Macon Johnson LLC
- 401 Macon Holdings LLC – 49% owner of Debtor
  - Mark J. Nussbaum – 100% owner of 401 Macon Holdings LLC

**1050 Bergen Realty LLC**:
- 1049 Bergen Johnson LLC – 51% owner of Debtor
  - Ervin Johnson, Jr. - 100% owner of 1596 Pacific Johnson LLC
- 1049 Bergen Holdings LLC – 49% owner of Debtor
  - Mark J. Nussbaum – 100% owner of 1049 Bergen Holdings LLC

**1597 Pacific Realty LLC**:
- 1596 Pacific Johnson LLC – 51% owner of Debtor
  - Ervin Johnson, Jr. - 100% owner of 1596 Pacific Johnson LLC
- 1596 Pacific Holdings LLC – 49% owner of Debtor
  - Mark J. Nussbaum – 100% owner of 1596 Pacific Holdings LLC

Holders of Class 4 Interests shall retain their interests in the Debtors as stated above. Class 4 Interests are unimpaired and deemed to accept the Plan.

**C. Resolution of Disputed Claims & Reserves**

*1. Objections.*

An objection to either the allowance of a Claim or an amendment to the Debtors' Schedules shall be in writing and may either be filed with the Bankruptcy Court or pursued and resolved by other means by the Debtors, at any time on or before the Effective Date, or for a period of sixty (60) days thereafter, or within such other time period as may be fixed by the Bankruptcy Court. Except as otherwise set forth in this Plan, (i) any Claim against any of the Debtors that arose prior to the Petition Date not filed with the Bankruptcy Court by the applicable bar date, unless specifically scheduled by the Debtors as nondisputed, noncontingent and liquidated, or (ii) any Administrative Claim not filed with the Bankruptcy Court by **January 24, 2019**, is hereby deemed invalid for all purposes. The Debtors will object to and settle any Claims and shall settle, compromise or prosecute all Claims objections. The Debtors shall have the discretion to settle disputed claims for an amount up to 100% of the amount claimed without further order of the Bankruptcy Court; but may seek an order of the Bankruptcy Court approving a settlement. In the event no order approving a settlement is sought, the Debtors shall file a notice of settlement and distribution on the Court docket.

*2. Amendment of Claims.*

A Claim may be amended prior to the Effective Date only as agreed upon by the Debtors and the holder of such Claim and as approved by the Bankruptcy Court or as otherwise permitted by the Bankruptcy Code and Bankruptcy Rules. After the Effective Date, a Claim may be amended as agreed upon by the holder thereof and the Debtors to decrease, but not increase, the

face amount thereof.

    *3.  Reserve for Disputed Claims.*

The Debtors shall reserve for account of each holder of a Disputed Claim that property which would otherwise be distributable to such holder on such date were such Disputed Claim an Allowed Claim on the Effective Date, or such other property as the holder of such Disputed Claim and the Debtors may agree upon.  The property so reserved for the holder, to the extent such Disputed Claim is allowed, and only after such Disputed Claim becomes a subsequently Allowed Claim, shall thereafter be distributed to such holder.

    *4.  Distributions to Holders of Subsequently Allowed Claims.*

Unless another date is agreed on by the Debtors and the holder of a particular subsequently Allowed Claim, the Debtors shall, on the first Business Day to occur after the fourteenth (14th) day after the Allowed amount of such theretofore Disputed Claim is determined, distribute to such holder with respect to such subsequently Allowed Claim the amount of distribution required under the Plan at that time, in Cash.  The holder of a subsequently Allowed Claim shall not be entitled to any interest on the Allowed amount of its Claim, regardless of when distribution thereon is made to or received by such holder.

**D.  Plan Funding and Means of Implementing the Plan**

    *1.  Plan Funding.*

As set forth on the chart attached as **<u>Exhibit "B"</u>**, the claims and fees expected to be paid in connection with confirmation of the Plan, together with the reserves for disputed claims and post-confirmation professional fees, total approximately $6,311,000. The Debtors have obtained a commitment for financing secured by a first priority lien in and upon the Premises in the amount of not less than $7,750,000 ("**<u>Exit Financing</u>**"). A copy of the commitment letter,

redacted for purposes of confidential information is attached hereto as **Exhibit "I"**. The Debtors intends to seek approval to enter into the Exit Financing prior to or contemporaneously with the hearing on confirmation of the plan. The Exit Financing shall be contributed to the Plan Distribution Fund.

The Plan shall be funded from the Plan Distribution Fund, which consists of (i) all of the Debtor's Cash on hand as of the Confirmation Date, (ii) net proceeds from the DIP Loan, and (iii) the proceeds of the Exit Financing. The Plan Distribution Fund shall be held pursuant to Section 345 of the Bankruptcy Code and ultimately distributed by the Disbursing Agent in accordance with the terms of the Plan. Except as otherwise provided in the Plan, including without limitation Article IX of the Plan, the first distribution from the Plan Distribution Fund shall be distributed by the Disbursing Agent on the later of the following dates: (i) on the Effective Date (or within 10 days thereafter to allow for the disbursement of the proceeds of the Exit Financing) to the extent the Claim has been Allowed or (ii) to the extent that a Claim becomes an Allowed Claim after the Effective Date, within fourteen (14) days after the order allowing such Claim becomes a Final Order.

    2. *Means for Implementation.*

On the Effective Date (or within 10 days thereafter to allow for the disbursement of the proceeds of the Exit Financing), the Disbursing Agent shall make the first distribution from the Plan Distribution Fund in accordance with the Plan. Thereafter, the Disbursing Agent shall make distributions from the Plan Distribution Fund when a Claim becomes and Allowed Claim as set forth above. After all creditors have been paid, any remaining funds shall be distributed to the Interest Holders according to their interests.

### E.  Executory Contracts and Leases

The Plan, in Section 7.1, states that during the pendency of the Chapter 11 Cases, the Debtors are deemed to have rejected all written leases or contracts that were executory, in whole or in part, to which any of the Debtors were a party, excepting (i) all written leases, if any, and all month-to-month tenancies affecting the Premises as of the Petition Date, and (ii) that certain Property Management Agreement between the Debtors and USA Quick Solutions Corp. dated as of January 1m 2018 (collectively, the "**Assumed Contracts**"). Any person or entity who may have a Claim that arose from rejection of an executory contract shall, to the extent such Claim becomes an Allowed Claim, has the rights of a holder of an Unsecured Claim in Class 3 with respect thereto**.** The Debtors are not aware of any executory contracts aside from the Assumed Contracts, or any claims arising from the rejection thereof.

### F.  Tax Consequence of the Plan

*Creditors Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors.*

Confirmation may have federal income tax consequences for the Debtors and Creditors. The Debtors have not obtained, and do not intend to request, a ruling from the Internal Revenue Service, nor have the Debtors obtained an opinion of counsel with respect to any tax matters. Any federal income tax matters raised by confirmation of the Plan are governed by the Internal Revenue Code and the regulations promulgated thereunder.  Creditors are urged to consult their own counsel and tax advisors as to the consequences to them, under federal and applicable state, local and foreign tax laws, of the Plan.  The following is intended to be a summary only and not a substitute for careful tax planning with a tax professional.  The federal, state and local tax consequences of the Plan may be complex in some circumstances and, in some cases, uncertain.

23

Accordingly, each holder of a Claim is strongly urged to consult with his or her own tax advisor regarding the federal, state and local tax consequences of the Plan, including but not limited to the receipt of cash and/or stock under this Plan.

### 1. Tax Consequences to the Debtors

The Debtors may not recognize income as a result of the discharge of debt pursuant to the Plan because Section 108 of the Internal Revenue Code provides that taxpayers in bankruptcy proceedings do not recognize income from discharge of indebtedness. However, a taxpayer is required to reduce its "tax attributes" by the amount of the debt discharged. Tax attributes are reduced in the following order: (i) net operating losses; (ii) general business credits; (iii) capital loss carryovers; (iv) basis in assets; (v) passive activity loss and credit carryovers; and (vi) foreign tax credit carryovers.

### 2. Tax Consequences to Unsecured Creditors

An unsecured creditor that receives cash in satisfaction of its Claim may recognize gain or loss, with respect to the principal amount of its Claim, equal to the difference between (i) the creditor's basis in the Claim (other than the portion of the Claim, if any, attributable to accrued interest), and (ii) the balance of the cash received after any allocation to accrued interest. The character of the gain or loss as capital gain or loss, or ordinary income or loss, will generally be determined by whether the Claim is a capital asset in the creditor's hands. A creditor may also recognize income or loss in respect of consideration received for accrued interest on the Claim. The income or loss will generally be ordinary, regardless of whether the creditor's Claim is a capital asset in its hands.

### G.    Causes Of Action

The Debtors will pursue all Causes of Action that should be pursued. The Debtors shall commence such actions no later than one hundred twenty (120) days after the Effective Date. The proceeds from any recoveries from Avoidance Actions shall be used to first pay any outstanding professional fees and expenses incurred in connection with the prosecution of Avoidance Actions, with the balance to be deposited into the Plan Distribution Fund for further distribution in accordance with the Plan.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Bankruptcy Code. These include the requirements that the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor at least as much as the creditor would receive in a chapter 7 liquidation case, unless the creditor votes to accept the Plan; and the Plan must be feasible. These requirements are _not_ the only requirements listed in § 1129, and they are not the only requirements for confirmation.  As there are no impaired classes under the Plan, the requirement for an assenting impaired class is not applicable.

### A.  Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor has a right to vote for or against the Plan only if that creditor has a claim that is both (1) allowed or allowed for voting purposes **_and_** (2) impaired.

In this case, as all creditors will be paid in full in cash the amount of their allowed claim within 10 days after the Effective Date. There are <u>no</u> classes impaired under the Plan and therefore no claimholders in any class are entitled to vote to accept or reject the Plan.

1.  *What Is an Allowed Claim?*

Only a creditor with an allowed claim has the right to vote on the Plan. Generally, a claim is allowed if either (1) the Debtors have scheduled the claim on the Debtors' schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim, unless an objection has been filed to such proof of claim. When a claim is not allowed, the creditor holding the claim cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

**The deadline for filing a proof of claim in this case was <u>April 30, 2018</u>.**

**The deadline for filing a proof of administrative claim in this case is <u>January 24, 2019</u>.**

2.  *What Is an Impaired Claim?*

As noted above, the holder of an allowed claim has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Bankruptcy Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

There are no Claims impaired under the Plan and therefore there are no holders of claims that are entitled to vote.

3.  *Who is **Not** Entitled to Vote*

The holders of the following five types of claims are *not* entitled to vote:

- holders of claims that have been disallowed by an order of the Court;
- holders of other claims that are not "allowed claims";

26

- holders of claims in unimpaired classes;
- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Bankruptcy Code; and
- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

### B.  Votes Necessary to Confirm the Plan

There are no impaired classes under this Plan.  All creditors are deemed to accept the Plan pursuant to Bankruptcy Code §1126(f). Therefore, no votes are being solicited to confirm the Plan.

### C.  Feasibility and Best Interests Test

The Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors (the "**Feasibility Test**").

For a plan to meet the Feasibility Test, the Bankruptcy Court must find that the Debtors will possess the resources to meet their obligations under the Plan. On the Effective Date (or within 10 days thereafter to allow for the disbursement of the proceeds of the Exit Financing), the Debtors will have sufficient funds to fund the Plan. All Allowed Claims will be paid in full.

***You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.***

The commitment letter for the Exit Financing demonstrates that the Debtors will have sufficient resources to pay the allowed claims as set forth in the plan and that the Plan is feasible.

In addition, the Bankruptcy Court must determine that the values of the distributions to be made under the Plan to each Class will equal or exceed the values which would be allocated

to such Class in a liquidation under Chapter 7 of the Bankruptcy Code (the "**Best Interest Test**").

The Best Interest Test with respect to each impaired Class requires that each holder of a Claim or Interest in such Class either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Because there are no impaired classes, no scenario exists, including but not limited to Chapter 7 liquidation, under which the creditors would be entitled to receive a distribution greater than that which the Debtors have proposed in their Plan. In fact, were the Debtors' assets liquidated in a Chapter 7 case, the creditors of the estate would stand to receive far less as the Administrative costs associated with such a case would be significantly higher.

The Debtors believe that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, including the "best interest" and feasibility requirements. The Plan is "fair and equitable" and "does not discriminate unfairly". The Plan complies with all other requirements of Chapter 11 of the Bankruptcy Code and the Plan has been proposed in good faith.

**D. Notices**

All notices and correspondence should be forwarded in writing to:

Jay Teitelbaum
TEITELBAUM LAW GROUP, LLC
1 Barker Avenue, Third Floor
White Plains, New York 10601
Tel: (914) 437-7670 / Fax: (914) 437-7672
jteitelbaum@tblawllp.com
*Attorneys for the Debtors and Debtors in Possession*

## EFFECT OF CONFIRMATION OF THE PLAN

### A.  Discharge of Debtors and Plan Injunction.

Upon the Effective Date, the Debtors shall receive a discharge to the extent provided for under section 1141 of the Bankruptcy Code.  To the fullest extent permitted by Section 1141(a)-(c) of the Bankruptcy Code, all payments and all distributions pursuant to the Plan, shall be in full and final satisfaction, settlement and release of all Claims and Interests, except as otherwise provided in the Plan.

### B.  Amendment, Modification, Withdrawal or Revocation of the Plan.

The Debtors reserve the right, in accordance with section 1127(a) of the Bankruptcy Code, to amend or modify the Plan prior to the Confirmation Date. After the Confirmation Date, the Debtors may, upon order of the Bankruptcy Court, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile and inconsistencies in the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan.

### C.  Unclaimed Property

Distributions to holders of Allowed Claims shall be sent to their last known address set forth on a proof of claim filed with the Bankruptcy Court or if no proof of claim is filed, on the Schedules, or to such other address as may be designated by such Creditor in writing to the Debtors. A payment is to be deemed unclaimed if the payment on the distribution is not negotiated by the particular claimholder within 120 days of it being sent by the Debtors. If after thirty (30) days additional attempted notice to the claimholder such distribution remains unclaimed or unnegotiated, then and in that event such holder's Claim shall thereupon be deemed canceled and any such holder shall not be entitled to any payments under the Plan, and such unclaimed distributions shall be returned to the Plan Distribution Fund and redistributed in

accordance with the Plan.

**D. Retention of Jurisdiction**

The Bankruptcy Court shall retain jurisdiction of the chapter 11 case:

(a)      To determine all controversies relating to or concerning the allowance of Claims upon objection to such Claims by the Debtor(s);

(b)      To determine requests for payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including any and all applications for compensation for professional and similar fees;

(c)      To determine any and all applications pursuant to section 365 of the Bankruptcy Code for the rejection, or assumption and/or assignment, as the case may be, of executory contracts and unexpired leases to which any Debtor is a party or with respect to which any Debtor may be liable, and to determine and, if necessary, to liquidate, any and all Claims arising therefrom;

(d)      To determine any and all applications, adversary proceedings, and contested or litigated matters over which the Bankruptcy Court has subject matter jurisdiction pursuant to 28 U.S.C. sections 157 and 1334;

(e)      To determine all Disputed Claims and amendments to the Debtors' Schedules;

(f)      To adjudicate controversies or interpretations pursuant to any order or stipulation entered by the Bankruptcy Court prior to the Confirmation Date;

(g)      To modify this Plan pursuant to section 1127 of the Bankruptcy Code or to remedy any defect or omission or reconcile any inconsistencies in this Plan or Confirmation Order to the extent authorized by the Bankruptcy Code;

(h)      To make such orders as are necessary or appropriate to carry out the provisions of

this Plan;

(i)    To resolve controversies and disputes regarding the interpretation or enforcement of the terms of this Plan;

(j)    To commence or prosecute the Causes of Action; and

(k)    To enter a final decree closing the Chapter 11 Case.

### E.  Post-Confirmation Fees, Reserves and Final Decree

The reasonable compensation and out-of-pocket expenses incurred post-Confirmation Date by the Debtors' professionals retained in the Chapter 11 Cases shall be paid by the Debtors within ten (10) days upon presentation of invoices for such professional services without further order of the Bankruptcy Court. All disputes concerning post-confirmation fees and expenses shall be subject to Bankruptcy Court jurisdiction.

The Debtors shall reserve $75,000.00 from the Plan Distribution Fund for the payment of post-Confirmation fees incurred by Debtors' attorneys and accountants in the continued prosecution of estate causes of action, adjudication of Claims, and in connection with the carrying out of duties and responsibilities for payment of Allowed Claims as well as payment of United States Trustee fees. The balance of such reserve, if any, shall be distributed in accordance with Article III of the Plan.

A final decree shall be entered as soon as practicable after initial distributions have commenced under the Plan.

*No further text on this page*

## <u>RECOMMENDATION</u>

The Debtors believe that Confirmation of the Plan is preferable to any available alternatives. The Plan will provide greater recoveries than those available in liquidation to all holders of Claims. Any other alternative would cause significant delay and uncertainty, as well as substantial additional administrative costs.

Dated: White Plains, New York
      December 24, 2018

                E&J MACON LLC

                By:/s/ Ervin Johnson, Jr
                   Ervin Johnson, Jr., Sole Member

                1596 PACIFIC REALTY, LLC

                By:/s/ Mark J. Nussbaum
                   Mark J. Nussbaum, Managing Member

                1049 BERGEN REALTY LLC

                By: /s/ Mark J. Nussbaum
                   Mark J. Nussbaum, Managing Member

                401 MACON REALTY LLC

                By: /s/ Mark J. Nussbaum
                   Mark J. Nussbaum, Managing Member

                TEITELBAUM LAW GROUP, LLC
                1 Barker Avenue, Third Floor
                White Plains, New York 10601
                Tel: (914) 437-7670 / Fax: (914) 437-7672
                jteitelbaum@tblawllp.com
                *Attorneys for the Debtors and Debtors in Possession*

                By: /s/ Jay Teitelbaum
                   Jay Teitelbaum